**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. JAMES THOMPSON,<br><br>        Plaintiff-Relator,<br>v.<br><br>MCKESSON CORPORATION<br><br>        Defendant. | Civil Action No. 1:16-cv-03891 (LDH) (RML) |

## FIRST AMENDED COMPLAINT

Plaintiff-Relator James Thompson, M.D., as and for his First Amended Complaint against Defendant McKesson Corporation for False Claims Act violations, alleges as follows:

## SUMMARY OF CLAIMS

1.      In 2009, the federal government passed a law incentivizing health providers, including hospitals, to convert from written health records to electronic health records by adopting "certified" electronic health records software and annually attesting to "meaningful use" objectives through that software. If hospitals did so, they would receive millions of dollars in incentive payments from the federal government.

2.      The final regulations included emergency room patients as part of the incentive plan. However, McKesson's emergency room electronic health records software, called "Horizon Emergency Care," could not satisfy 10 of the 23 "meaningful use" objectives required to pass certification testing and gain incentive compensation eligibility. McKesson knew this, admitting in writing to its own hospital customers or potential customers that Horizon Emergency Care did not have any functionality for 10 of 23 requirements, promising to add them, and properly test and certify the software.

-1-

3.      Unfortunately, McKesson failed to fix that software to add that functionality. Instead, fearing it would miss out on millions of dollars in hospital customer fees and worried that it would take too much time to fix, McKesson chose not to present Horizon Emergency Care for certification testing when McKesson presented its inpatient hospital electronic health records software, Horizon Clinicals, for certification testing in November 2010 with a government-accredited testing body, the Drummond Group.

4.      Instead, in February 2011, McKesson falsely attested to Drummond that "Horizon Clinicals" had been "renamed" as "Horizon Clinicals" plus "Horizon Emergency Care"—which Drummond relied upon and accepted as true in not requiring any certification testing for Horizon Emergency Care. It was not true. Horizon Clinicals and Horizon Emergency Care were different software programs that did not integrate with each other. Horizon Clinicals could satisfy the required meaningful use objectives. Horizon Emergency Care could not.

5.      The next month, McKesson falsely attested to Drummond that Horizon Emergency Care, now certified with Horizon Clinicals as a new name change, should receive "inherited" certification status as module software (a stand-alone product that could met at least one "meaningful use" objective and which gave the impression to customers that it had been lawfully certified in some way at some point). Again, Drummond, having no reason to know McKesson was lying, relied on and accepted as true McKesson's request for "inherited" in approving module certification status for Horizon Emergency Care.

6.      Voilà. With this sleight of hand, despite the fact that Horizon Emergency Care had never been tested by Drummond—as explicitly required by the government's regulations—and despite the fact that it would have failed if it had been tested (on at least 10 of the 23 necessary

functions required for incentive payment eligibility), McKesson could now plausibly market Horizon Emergency Care as "certified."

7.     As a result of McKesson's false certifications, McKesson sold Horizon Clinicals bundled with Horizon Emergency Care as "complete" electronic records software to hundreds of hospitals, earning hundreds of millions in annual licensing and maintenance revenue for that software. By doing so, McKesson caused those hospitals to falsely certify that their electronic health records software complied with federal regulations, thereby receiving incentive payments under a federal incentive program for which they would otherwise be ineligible. Relator Dr. Thompson, on behalf of the United Stated Government, seeks as damages recovery of those payments, plus treble damages, attorney fees, and other appropriate relief.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action under 31 U.S.C. § 3732, 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

9.     This Court has personal jurisdiction over McKesson because McKesson transacts business in this District and committed proscribed acts that are the subject of this action in this District.

10.     Venue lies in this District under 31 U.S.C. § 3732(a) because McKesson can be found and transacts business in this District and committed acts proscribed by 31 U.S.C. § 3729 in this District.

## PARTIES

11.     The United States of America is the real party in interest to this action and brings it on behalf of the United States Department of Health and Human Services and the Centers for Medicare & Medicaid Services, which administer the Medicare and Medicaid programs.

12.     Relator Dr. James Thompson is a licensed physician, board certified in internal and emergency medicine, who has worked in various roles in the healthcare field for over four decades, including as an attending emergency department physician, a university-based assistant clinical professor of medicine, and a director of informatics for a regional hospital system. In 2005, Dr. Thompson was hired by McKesson as a vice president of medical affairs, tasked with assisting the company's provider technology division with its variety of software products related to hospital-based care of patients, and which McKesson marketed under the brand "Horizon Clinicals." In 2010, Dr. Thompson was the McKesson physician who performed the clinical portions of the Horizon Clinicals certification testing for McKesson with the Drummond Group. Dr. Thompson was outspoken about the defects in Horizon Clinicals, and in 2013 his position was terminated by McKesson.

13.     Defendant McKesson Corporation is a Delaware corporation whose stock trades on the New York Stock Exchange under the ticker MCK. For fiscal year 2024, McKesson reported annual revenues of $309 billion, it employed approximately 48,000 employees, and it reported a market capitalization of $73.59 billion. More than half of U.S. hospitals use McKesson's electronic health software technology.

## BACKGROUND

**A.      Electronic Health Records**

14.     An "Electronic Health Record," or "EHR," refers to electronically stored health information about an individual that has the capacity to: (a) provide clinical decision support; (b) support physician order entry; (c) capture and query information relevant to health care quality; and (d) exchange electronic health information with, and integrate such information from, other sources. *See* 42 U.S.C. § 300jj(13) (defining "qualified electronic health record").

15.     As the Congressional Budget Office observed in 2008, if "used effectively, EHRs can enable providers to deliver health care more efficiently" and "improve the quality of health care." Congressional Budget Office, "Evidence on the Costs and Benefits of Health Information Technology" (May 2008), *available at* https://www.cbo.gov/sites/default/files/110thcongress-2007-2008/reports/05-20-healthit.pdf (last visited Dec. 18, 2024).

**B.    The HITECH Act**

16.     Accordingly, the federal government in 2009 enacted the Health Information Technology for Economic and Clinical Health Act of 2009, Pub. L. 111-5 (Feb. 17, 2009) ("HITECH Act"), which created financial incentives for eligible hospitals and doctors to acquire "certified EHR technology" and put it to "meaningful use," with an initial allocation of funding of $19.2 billion.

17.     Under the HITECH Act, "The term 'certified EHR technology' means a qualified electronic health record that is certified pursuant to section 3001(c)(5) as meeting standards adopted under section 3004 that are applicable to the type of record involved." 42 U.S.C. § 300jj(1); *see also id.* § 300jj(13) (defining "qualified electronic health record").

**C.    The Office of the National Coordinator and the EHR Certification Process**

18.     To help carry out the HITECH Act's objectives, the Act established a new office, the Office of the National Coordinator for Health Information Technology within the Department of Health and Human Services. *See* 42 U.S.C. § 300jj-11.

19.     The Office of the National Coordinator's responsibilities included, among other things, creating and overseeing a program for healthcare software vendors, such as McKesson, to have their EHR technology tested and certified by an accredited testing organization. *See* 42 U.S.C. § 300jj-11.

20.     On July 28, 2010, the Office of the National Coordinator published a "final rule to complete the adoption of an initial set of standards, implementation specifications, and certification criteria, and to more closely align such standards, implementation specifications, and certification criteria with final meaningful use Stage 1 objectives and measures." 75 Fed. Reg. 44,590, 44,590 (July 28, 2010). (The incentive program provided for three stages of "meaningful use"; meaningful use stage 1 objectives and measures are discussed below).

21.     Under the Office of the National Coordinator's final rule, healthcare software vendors like McKesson could submit either a "Complete EHR" or an "EHR Module" for testing and certification. *See* 42 C.F.R. § 170.510; se*e also* 75 Fed. Reg. at 44,592 ("The purpose of this final rule, therefore, is to adopt standards, implementation specifications, and certification criteria to test and certify that a Complete EHR or EHR Module provides certain capabilities, and where applicable, to require that those capabilities be implemented in accordance with adopted standards and implementation specifications.").

22.     "Complete EHR" meant "EHR technology that has been developed to meet, at a minimum, all applicable certification criteria adopted by the Secretary." 75 Fed. Reg. at 44,649.

23.     An "EHR Module" meant "any service, component, or combination thereof that can meet the requirements of at least one certification criterion adopted by the Secretary." 75 Fed. Reg. at 44,595.

24.     The federal government delegated the administration of EHR technology testing and certification to private organizations under federally established standards.

25.     The Drummond Group, a private corporation, was one such accredited organization, authorized by the federal government to perform testing and certification of EHR technology for the federal government's incentive program.

26.     As noted, federal regulations allowed for the certification of an individual "EHR Module" or a "Complete EHR." 42 C.F.R. § 170.510.

27.     For either certification, the process a software vendor had to follow was to arrange for a test date with an approved testing organization (in McKesson's case, Drummond) and review the "scripts" with the testing organization that contained the specific functionality tests to be administered.

28.     Vendors were permitted to clarify items with their testing body prior to the test date, and the certification test was administered remotely, via live teleconferencing.

**D.     Meaningful Use**

29.     Under the HITECH Act, as noted, a hospital seeking incentive payments had to not only acquire certified EHR software technology but also had to demonstrate "meaningful use" of that software technology.

30.     On July 28, 2010, the Centers for Medicare & Medicaid Services, another agency within the Department of Health and Human Services, published a final rule to implement the HITECH Act's provisions "that provide incentive payments to . . . eligible hospitals . . . participating in Medicare and Medicaid programs that adopt and successfully demonstrate meaningful use of certified [EHR] technology." 75 Fed. Reg. 44,314, 44,314 (July 28, 2010). The Centers for Medicare & Medicaid Services' final rule explained:

an eligible hospital shall be considered a meaningful EHR user for the relevant EHR reporting period for a payment year if they meet the following three requirements: (1) Demonstrates use of certified EHR technology in a meaningful manner; (2) demonstrates to the satisfaction of the Secretary that certified EHR technology is connected in a manner that provides for the electronic exchange of health information to improve the quality of health care such as promoting care coordination, in accordance with all laws and standards applicable to the exchange of information; and (3) using its certified EHR technology, submits to the Secretary, in a form and manner specified by the Secretary, information on clinical quality measures and other measures specified by the Secretary.

75 Fed. Reg. at 44,324; *see also* 42 U.S.C. § 1395ww(n) (defining "Meaningful EHR User").

31.    The Centers for Medicare & Medicaid Services final rule added, "we are establishing a core set of objectives with associated measures and a menu set of objectives with associated measures," cautioning: "While each element is important in the management of patients in and of itself, the aggregate of the elements elevates the importance of clinical information to not only the primary provider but for all members of the interdisciplinary team involved in the patient's care." 75 Fed. Reg. at 44,327, 44,328. The final rule explained:

> Exchange of information to other members of the health care team across settings will depend on having structured data of these elements. Therefore, in support of the HITECH Act in meeting the statutory requirements, we have expanded the core set of measures to include these fundamental elements to improve patient care. Below we list the objectives included in the core set of meaningful use objectives [*i.e.,* 14 "core set objectives"]
>
> — Use CPOE [*i.e.*, computerized physician order entry]
> — Implement drug to drug and drug allergy interaction checks
> — Record demographics
> — Maintain an up-to-date problem list
> — Maintain active medication list
> — Maintain active medication allergy list
> — Record and chart changes in vital signs
> — Record smoking status
> — Implement one clinical decision support rule
> — Report CQM [*i.e.*, clinical quality measures] as specified by the Secretary
> — Electronically exchange key clinical information
> — Provide patients with an electronic copy of their health information
> — Provide patients with an electronic copy of their discharge instructions
> — Protect electronic health information created or maintained by certified EHR.

75 Fed. Reg. at 44,328; 42 C.F.R. § 495.6(f).

32.    In addition to requiring 14 "core set objectives" to be eligible for incentive payments, the Final Rule required that hospitals also had to provide EHR functionality and measures on 5 of 10 "menu set objectives" as follows: 42 C.F.R. § 495.6(g). The Final Rule's 10 "menu set objectives" are:

    —Implement drug formulary checks.

—Record advance directives for patient 65 years old or older.
—Incorporate clinical lab-test results into EHR as structured data.
—Generate lists of patients by specific conditions.
—Use certified EHR technology to identify patient-specific education resources.
—Medication reconciliation for patients from other provider settings.
—Summary care record for hospital patient transitions.
—Submit electronic data to immunization registries or information systems.
—Submit electronic data on reportable lab results to public health agencies.
—Submit electronic syndromic surveillance data to public health agencies and actual submission.

75 Fed. Reg. at 44,596; 42 C.F.R. § 495.6(g).

E.    **Incentive Payments**

33.    Hospitals that both acquired certified EHR software technology and demonstrated the required "meaningful use" of that software technology became eligible for annual incentive payments from Medicare and Medicaid.

34.    The amount of the Medicare incentive payment would be equal to the product of three numbers: the "Initial Amount," the "Medicare Share," and the "Transition Factor." 42 U.S.C. § 1395ww(n); 42 CFR § 495.104.

35.    The "Initial Amount" for eligible hospitals was measured in the millions of dollars: a $2 million base amount plus an additional amount up to $4,370,400 based on a given hospital's number of acute care discharges for that year, for a total potential payment of $6,370,400.

36.    The "Medicare Share" was (generally) the percentage of a hospital's bed-days that are paid for by Medicare.

37.    The "Transition Factor" was a number from 0.25 to 1.00 that reflected how quickly a hospital attained eligibility and for how many years it had received incentive payments (the "Transition Factor" provided an incentive for hospitals to quickly integrate EHR systems). A hospital would have a 1.00 "Transition Factor" in its first year of using certified EHR software

technology if the hospital used it in 2011, 2012, or 2013, and the hospital would have a smaller "Transition Factor" number in subsequent years.

38.     Additionally, acute care hospitals and children's hospitals were eligible to receive Medicaid incentive payments. 42 C.F.R. § 495.302.

39.     The calculation was similar to that under Medicare: a hospital's Medicaid incentive payment would equal a base amount of $2 million, plus $200 per discharge within certain thresholds, multiplied by a transition factor of 0.25 to 1.00, multiplied by the "Medicaid Share" (the share of a hospital's inpatient non-charity care days attributable to Medicaid inpatients). *See* 75 Fed. Reg. at 44,498; *see also* 42 C.F.R. § 495.310.

40.     The above financial incentives proved immensely successful throughout the period relevant to this action. As of December 2015, for example, nearly 5,000 hospitals— approximately 90% of all hospitals in the country—registered for Medicare and Medicaid Incentive Payments, with the vast majority also dually-registered for Medicaid and Medicaid Incentive Payments. And as of 2015, the hospitals had applied for, and the federal government had paid, a total of over $11.6 billion in incentive payments.

41.     As discussed below, because of McKesson's fraud, however, approximately $950 million of these incentive payments were wrongly claimed by hospitals and paid by the federal government.

## **ALLEGATIONS**

### A.    **McKesson's Background**

42.     McKesson opened for business in 1833 as a drug import and wholesale business. *See* https://www.mckesson.com/about-mckesson/our-history/ (last visited Dec. 22, 2024).

43.    In 1998, McKesson, at that time primarily a pharmaceutical distributor, acquired HBO & Company. This $14.5 billion acquisition brought McKesson into the market for EHR software technology systems.

44.    Over the next decade, McKesson continued to add various EHR components to the base product suite it acquired with HBO & Company through acquisition of established niche vendors, bundling most of these components under the heading of the "Horizon Clinicals" software suite.

45.    By 2007, the Horizon Clinicals suite was comprised of a seriously disjointed, incompatible collection of various component parts.

46.    The reason for this was McKesson's acquisition and development strategy and history. Before McKesson acquired the disparate components and rebranded them as part of "Horizon Clinicals" software suite, the components had been built by different niche developers who had used different proprietary standards for data representation, different paradigms for clinical modeling, different mechanisms for inbound and outbound interfaces, different architectural layers using different database models, and so forth.

47.    By 2010, hospitals were demanding that their EHR software come from a single vendor so that the hospital would not have to perform the integration itself. However, McKesson's development team was unable to adequately integrate these dozens of components into a single software suite. As a result, McKesson falsely claimed to hospitals that its component branded "Horizon" was seamlessly integrated into a unified whole.

**B.    McKesson's "Horizon Emergency Care" EHR Software**

48.    Among the components McKesson generally branded "Horizon" was an emergency department software suite called "Horizon Emergency Care."

49.     Like most other Horizon Clinicals components, Horizon Emergency Care was originally created by third-party vendors as an aggregation of components that McKesson attempted to combine into a stand-alone system.

50.     As such, Horizon Emergency Care had its own original code for sourcing, storing, displaying and maintaining problems, allergies, and medications. So clinicians using Horizon Emergency Care within the context of the entire Horizon Clinicals suite (*i.e.*, as part of a "complete" EHR) would not have the ability to use or interact with the other components of the suite (such as McKesson's software components for inpatient care or pharmacy care).

51.     Thus, for example, if treatment utilizing a critical medication was initiated in the emergency department and entered as a record into Horizon Emergency Care, that record would not flow over to the patient's medication list as seen by other clinicians throughout a hospital stay because of the inability of Horizon Emergency Care to functionally communicate with the other components of Horizon Clinicals.

52.     Similarly, if an attending physician came to the emergency department to see a patient, that physician would be unable to write a prescription for that patient and communicate the existence of that prescription to the inpatient providers because the emergency department ordering system for medications was not integrated with the inpatient systems.

## C.     McKesson's Regulatory Surprise

53.     With the passage of the HITECH Act in 2009, it became imperative for software vendors like McKesson to have their products accredited as "certified EHR technology" by an authorized testing and certification body; indeed, no hospital would purchase uncertified software since it would then be ineligible for millions of dollars in incentive payments.

54.     When the preliminary guidance for certification criteria was published in early 2010, the Horizon Clinicals marketing team began assuring McKesson's customers that McKesson would obtain testing and certification for Horizon Clinicals as early as the program allowed. And the Horizon Clinicals development team began preparing for the actual testing process, which was scheduled for later that year.

55.     Additionally, to reassure its customers that Horizon Clinicals had overcome prior criticisms that it was only a loose collection of poorly integrated individual components, McKesson planned to certify Horizon Clinicals as a "Complete EHR" which by definition could perform all of the certification criteria for a customer purchasing the entire Horizon Clinicals suite.

56.     In July 2010, as noted, the Office of the National Coordinator published its final rule setting out the specific certification criteria. That rule clarified that the meaningful use objectives, such as reporting clinical quality measures, applied to patients admitted to the hospital's "inpatient or *emergency department*." Fed. Reg. 44,590 at 44,603, 44,606, 44,607, 44,613, 44,624, 44,627, 44,629, 44,635, 44,636, 44,637, and 44,642 (emphasis added).

57.     Thus, emergency department patients were expressly included in measures for 13 meaningful use "core set objectives" and 10 meaningful use "menu set objectives" described in paragraphs 31-32 above. *See id*.

58.     This requirement made good sense. A typical hospital emergency department sees many times more patients than the number of patients that are admitted as inpatients. In particular, at least 50 percent and as many as 70 percent of patients admitted as inpatients begin in the emergency room, and the emergency department provides care to roughly five times as

many patients as the inpatient Hospital departments.[1] And patients who are admitted as inpatients have much of their critical care treatment delivered in the emergency department.

59.     The inclusion of emergency department patients in the final rule caught McKesson flatfooted. McKesson had been preparing Horizon Clinicals for testing with an assumption that emergency department patients would not be included in the rule. McKesson was painfully aware that no hospital would purchase Horizon Clinicals without a "complete" EHR software that now included the emergency rooms services; otherwise, the hospital would not be eligible for incentive payments.

**D.    McKesson's Solution: Fraudulent Certification**

60.     After the Office of the National Coordinator's final rule was released on July 28, 2010, McKesson's product management team for Horizon Emergency Care, including Horizon Emergency Care product managers Beth Strandell and Jesse Johar, were immediately tasked with deciding if Horizon Emergency Care could pass certification testing.

61.     However, McKesson had already decided not to invest company resources into improving Horizon Emergency Care or integrating it with Horizon Clinicals. Based on his role as McKesson's vice president of medical affairs for Horizon Clinicals development, Dr. Thompson was intimately aware of that decision.

62.     Nevertheless, McKesson sales and marketing teams were already reassuring customers that Horizon Emergency Care could, should, and would be certified. For example, in a draft "Stimulus Readiness" presentation dated September 22, 2010, McKesson business analysis

---

[1] https://www.rand.org/pubs/research_reports/RR280.html (in 2009, the national average hospital admission was 50% from emergency room admission).

https://www.acepnow.com/article/latest-data-reveal-the-eds-role-as-hospital-admission-gatekeeper/ (in 2017, the national average hospital admission was 70% from emergency room admission).

group director Melody Kolb estimated that incentive payouts for a single mid-sized customer (Heritage Valley) would total $14.8 million to $16.3 million. The presentation explains that emergency department patients are included in calculations and lists Horizon Emergency Care as a "required" solution for incentive payment eligibility, with "certification planned" for all 23 "core set objectives" and "menu set objectives," thus necessitating the certification of Horizon Emergency Care.

63.     McKesson had a problem. The same month, McKesson's product management team for Horizon Emergency Care, including Horizon Emergency Care product managers Beth Strandell and Jesse Johar, determined that Horizon Emergency Care would fail certification testing for at least 10 of those "core set objectives" and "menu set objectives" criteria until "enhancements" could be made at some future date after the scheduled certification testing of Horizon Clinicals in November 2010. In short, Horizon Emergency Care would not be ready for certification testing when Horizon Clinicals was tested in November 2010.

64.     On September 28, 2010, Beth Strandell and Jesse Johar, along with McKesson's vice president of product management, Mark Pilarski, presented their analysis to customers in a McKesson "Achieve HIT Webinar."

65.     In that webinar, they acknowledged that the final rule brought "patients seen in the ED [*i.e.*, emergency room]…into the denominator of meaningful use measures." Critically, they admit below that Horizon Emergency Care *had no* functionality for 8 of 14 "core set objectives" required, as noted above in paragraphs 31-32 above, for EHR certification for meaningful use incentive payment eligibility, as follows:

# Summary of Changes for Horizon Emergency Care Customers – Core Objectives

**McKESSON** Empowering Healthcare

| Core Objectives | ED Workflow Change | HEC Enhancement |
|---|---|---|
| 1: CPOE for Medication Orders | No | No |
| 2: Drug-Drug, Drug-Allergy Checks | No | No |
| 3: Record Demographics | No | No |
| 4: Up-to-date Problem Lists | Yes | Yes |
| 5: Active Medication List | No | No |
| 6: Active Medication Allergy List | No | No |
| 7: Chart Vital Signs: Growth Chart | Yes | Yes |
| 8: Record Smoking Status | Yes | Yes |
| 9: One Clinical Decision Support Rule | No | No |
| 10: Report Clinical Quality Measures | Yes | Yes |
| 11: e-Copy of Health Information | Yes | Yes |
| 12: e-Copy of Discharge Instructions | Yes | Yes |
| 13: e-Exchange Key Clinical Information | No | Yes |
| 14: Security and Data Protection | No | Yes |

- No required workflow changes from 10.1
- Reduced urgency with new POS 23 interpretation
- Stage 1 ED workflow changes and enhancements
- Workflow changes when converting to Horizon Expert Orders from HEC Native Orders

Important Note: This document is only intended to serve as a planning guide and should not be considered a final implementation plan. The information is based on McKesson's interpretation of 8 rules published by the Department of Human Services and are subject to change. Be sure to check the McKesson Customer Portal to download the latest version of this document. The information express or implied warranties. Using certified electronic health record (EHR) systems and other certified health IT to prove meaningful use is the responsibility of eligible providers and hospitals.

66.    Critically, they admit below that Horizon Emergency Care had no functionality for 2 of 9 "menu set objectives" required, as noted in paragraphs 31-32 above, for EHR certification for meaningful use incentive payment eligibility, as follows:

# Summary of Changes for Horizon Emergency Care Customers – Menu Objectives



| Menu Objectives | ED Workflow Change | HEC Enhancement |
|---|---|---|
| 1: Drug Formulary Checks | No | No |
| 2: Advanced Directives | Not Applicable | Not Applicable |
| 3: Incorporate Lab Results into EHR | Unlikely | No |
| 4: Generate Lists of Patients | No | No |
| 5: Identify Patient Specific Education | Unlikely | No |

- No required workflow changes from 10.1

| | | | |
|---|---|---|---|
| 6: Medication Reconciliation | Yes | Yes | • Reduced |
| 7: Provide Summary of Care at Transitions | Yes | Yes | urgency with new POS 23 interpretation |
| 8: e-Submit Immunization Data | Yes | No | |
| 9: e-Submit Reportable Lab Results | No | No | |
| 10: e-Submit Syndromic Surveillance Data | No | No | |

Important Note: This document is only intended to serve as a planning guide and should not be considered a final implementation plan. The information is based on McKesson's interpretation of the final meaningful use and certification rules published by the Department of Human Services and are subject to change. Be sure to check the McKesson Customer Portal to download the latest version of this document. The information provided is "as is" and without any express or implied warranties. Using certified electronic health record (EHR) systems and other certified health IT to prove meaningful use is the responsibility of eligible providers and hospitals.

67.    In other words, in this web presentation, McKesson admitted that Horizon Emergency Care didn't have *any functionality* as required by the regulations for 10 of 23 "core set objectives" and "menu set objectives" noted in paragraphs 31-32 above as follows:[2]

8 missing "core set objectives":[3]

—Up-to-date problem list (Maintain an up-to-date problem list)
—Chart Vital Signs: Growth Chart (Record and chart changes in vital signs)
—Record smoking status
—Report Clinical Quality Measures (Report CQM [*i.e.*, clinical quality measures] as specified by the Secretary)
—e-Copy of Health Information (Provide patients with an electronic copy of their health information)
—e-Copy of Discharge Instructions (Provide patients with an electronic copy of their discharge instructions)
—e-Exchange Key Clinical Information (Electronically exchange key clinical information)
—Security and Data Protection (Protect electronic health information created or maintained by certified HER)

2 missing "menu set objectives":

—Medication reconciliation for patients from other provider settings.
—Provide Summary of Care at Transitions (Summary care record for hospital patient transitions).

----

[2] One of the "menu set objectives", advanced directives, was "not applicable" to emergency rooms, making the total number 23 instead of 24.

[3] McKesson's webinar description with the regulatory definition next to it in parenthesis.

68.     In the same web presentation, Ms. Strandell, Mr. Johar, and Mr. Pilarski admitted that "due to the nature & breadth of changes announced" in the final rule, changes to Horizon Emergency Care would be necessary, but said those changes would be made in a subsequent "service pack" for which a "timeline [was] currently being developed," which had a "target" of the "end of calendar year 2010," that is, after the certification testing of Horizon Clinicals. Most important, they explained that those "core set objectives" and "menu set objectives" for which Horizon Emergency Care had no functionality would be later added or "enhanced."

69.     Nevertheless, they asserted that "Horizon Emergency Care will be part of the Horizon Clinicals certification." That assertion was later proven false, as discussed below, by McKesson's false representations made to Drummond six months later in February and March of 2011.

70.     McKesson never presented Horizon Emergency Care for certification testing.

**E.    McKesson Presents Horizon Clinicals (without Horizon Emergency Care) for Certification Testing**

71.     McKesson's presentation of Horizon Clinicals for certification testing proceeded as scheduled with Drummond on November 11, 2010.

72.     In making this presentation, McKesson chose only the components of the Horizon Clinicals software suite available for use with hospital inpatients (admitted from the emergency room or by appointment). McKesson knowingly and deliberately excluded Horizon Emergency Care from certification testing because McKesson knew, as evidenced by the web presentation above, that if presented for testing, Horizon Emergency Care would fail and thus not receive certification (because it was unable to meet 10 of 23 required "core set objectives" and "menu set objectives").

73.    Dr. Thompson presented the clinical portions of the Horizon Clinicals test to Drummond. Neither he nor anyone else presented any portion of Horizon Emergency Care for certification testing.

74.    After McKesson's presentation of Horizon Clinicals for certification testing in November 2010, McKesson named the bundle of software it had certified "Horizon Clinicals v10.3.1" as a "Complete Inpatient EHR."

**F.    McKesson's Sleight of Hand**

75.    After Horizon Clinicals was certified as a "complete" EHR, it became clear from internal discussion in which Dr. Thompson was involved that McKesson's hoped-for solution described above in McKesson's September 2010 webinar—*i.e.,* developing software "enhancements" to Horizon Emergency Care while the Horizon Clinicals underwent certification testing, and shortly thereafter presenting Horizon Emergency Care for testing and certification—was too expensive, complicated, and time-consuming.

76.    McKesson therefore abandoned its plan for seeking certification testing of Horizon Emergency Care. Instead, McKesson came up with a new plan, which was to lie to the government's testing authority Drummond.

77.    In January 2011, McKesson transferred Dr. Thompson to Horizon Clinicals development in Westminster, Colorado, as vice president of medical affairs, reporting to Gerry McCarthy, senior vice president of product management and marketing, and Marcy Tatsch, vice president of product management (Ms. Tatsch reported to Mr. McCarthy), both of whom were also in Westminster, Colorado.

78.    During this time, Dr. Thompson had weekly conversations with Mr. McCarthy and Ms. Tatach, he was present at most high-level meetings with product management, and he

was involved with the evaluation around whether to replace Horizon Clinicals with a different McKesson EHR software program called Paragon.

79.    In February 2011, Ms. Tatsch decided, with Mr. McCarthy's consent, to try to create the false perception that Horizon Emergency Care had been tested and certified.

80.    *First*, on February 25, 2011, Ms. Tatsch, in Westminster, Colorado (the main center for McKesson's Horizon Clinical development office), sent the Drummond Group in Austin, Texas a "Certification Attestation Document"—which she represented was "true and correct" on behalf of McKesson—requesting a "name change only" from McKesson's previously certified product, Horizon Clinicals v.10.3.1, *adding Horizon Emergency Care*.

81.    *Second*, on March 10, 2011, Ms. Tatsch, again from Westminster, Colorado, wrote to the Drummond Group in Austin, Texas—which she again represented on behalf of McKesson was "true and correct" through a "Certification Attestation Document"—seeking "module"[4] certification for *Horizon Emergency Care* as "inherited" from Horizon Clinicals v.10.3.1 and *Horizon Emergency Care* (*i.e.*, "inherited" from the "name change).

82.    In other words, explaining that this was a "name change only," Ms. Tatsch requested that certification be given to Horizon Emergency Care. Because it was a name change only, no testing would be necessary. She then requested that Horizon Emergency care, "certified" through the name change, be given "inherited" module certification. Because it was inherited certification only, again, no testing would be necessary.

83.    These false certifications—concealing the fact that Horizon Emergency Care was functionally unable to meet 10 of 23 "core set objectives" and "menu set objectives" legally

---

[4] As noted above, tested and certified EHR technology that meets at least one meaningful use objective.

required for certification—were intended to create the appearance of certification on paper in order for the sales team to market and sell Horizon Clinicals and Horizon Emergency Care as a "complete" HER software suite to hospitals.

84.     Ms. Tatsch's plan worked. On March 29, 2011, without a single line of code being tested or retested, Drummond certified "Horizon Clinicals" as "Horizon Clinicals Complete EHR [and] *Horizon Emergency Care*."[5] (Emphasis added.)

85.     On April 7, 2011, again without a single line of code being tested or retested, Drummond certified Horizon Emergency Care as a stand-alone modular EHR.

86.     Through these false representations, Ms. Tatsch, on behalf of McKesson, misled Drummond that Horizon Emergency Care, McKesson's only EHR technology for emergency department patients, had previously undergone certification testing and qualification when it *never* had and *never* would.

87.     Had McKesson told the truth to Drummond about Horizon Emergency Care's noncompliance with regulatory requirements, Drummond would not have approved Horizon Emergency Care's certification.

88.     As discussed more fully below, Dr. Thompson raised objections to Ms. Tatsch's plan at the time she implemented it, stating that he did not agree to it. After he raised these objections, McKesson transferred him out of his position working on Horizon Clinicals development.

---

[5] The full name was: "Horizon Clinicals Complete EHR: Horizon Infrastructure (including Horizon Connect), Horizon Health Summary, Horizon Expert Orders, Horizon Expert Documentation, Horizon Admin-Rx, Horizon Medication Reconciliation, McKesson Enterprise Reporting, Horizon Physician Portal 13.1, *Horizon Emergency Care*, McKesson Quality eMeasures 1.0, and Horizon Business Insight 15.0 ARRA SP." (Emphasis added).

**G.    McKesson Lies to Customers About Horizon Emergency Care**

89.    After McKesson's sleight of hand was completed, McKesson promptly sold Horizon Emergency Care *and* Horizon Clinicals as "complete" EHR *bundled software package* to hospitals for licensing and maintenance subscription fees.

90.    Yet only Marcy Tatsch and a tiny circle of insiders (including Dr. Thompson), knew how McKesson had cheated the federal government's program. That program, discussed above, was designed "to improve health care quality, safety, and efficiency" through enhancing "the interoperability, functionality, utility, and security of health information technology." 75 Fed. Reg. at 44,590-91.

91.    Horizon Emergency Care, as also discussed above, did none of this. It was not interoperable with the rest of the Horizon Clinicals suite. Indeed, it was not even internally functional— it was unable to perform 10 of the 23 mandatory objectives for which the rules create certification criteria. And because it was neither interoperable nor functional, it had no utility in improving health care quality, safety, or efficiency.

92.    Nevertheless, because only a handful of insiders, including Ms. Tatsch and Dr. Thompson, were aware that McKesson had cheated the federal government's system to create the illusion that Horizon Emergency Care was certified EHR technology, McKesson salespeople promptly began to market Horizon Emergency Care as certified EHR technology.

93.    This, however, posed a problem for the McKesson sales and marketing teams because of Horizon Emergency Care's numerous deficiencies (as admitted, in part, in McKesson's September 2010 webinar), none of which had ever been addressed with any of the promised "enhancements." McKesson therefore needed to engage in deceptive marketing to customers.

94.    To take just one example (of dozens), McKesson marketed Horizon Clinicals as having a single database or "instance" of critical patient information, such as patient allergies and medications. McKesson did so repeatedly, including at the largest conference and exhibition in the information technology field in the U.S., the Health Information and Management Systems Society's annual conference and exhibition, which was held in Orlando, Florida from February 20-24, 2011, for which Dr. Thompson was personally present. At this conference, McKesson sales members described McKesson's "Enterprise Data Model" as having "a single storage location" for allergies and medications that was shared by its various applications. This was blatantly false. Horizon Emergency Care used an entirely different database than the rest of Horizon Clinicals to store, access, and modify patient information.

95.    Additional deceptions included, but were not limited to:

- Deceiving customers about the ability of Horizon Emergency Care to order or manage medications or to add problems by using "hardcoded" patient examples in demonstrations (the Horizon Emergency Care product actually delivered to customers had no such code);

- Deceiving customers through the use of these "hardcoded" patient examples into believing that Horizon Emergency Care could perform the functions required by meaningful use for a given patient starting from admission to the emergency department and through discharge from the hospital;

- Deceiving customers about complaints from existing customers, misrepresenting that the problems were associated with early versions of Horizon Emergency Care, which were now resolved with the "One McKesson" certified version of Horizon Emergency Care (as noted, the fundamental software defects that plagued Horizon Emergency Care were never able to be fixed); and

- Deceiving customers by reassuring them that 70 or more clinically-oriented developers were rapidly addressing any remaining flaws in Horizon Emergency Care, and that the deep pockets of McKesson Corporation as a Fortune 5 company meant that all necessary resources would be expended to ensure that the basic clinical workflows mandated by meaningful use would function properly within Horizon Emergency Care (in fact, the resources devoted to Horizon Emergency Care were a tiny fraction of that—typically,

one doctor, two nurses, and six or eight programmers—which was insufficient to fix the flaws in Horizon Emergency Care).

96.     Perhaps the most pervasive deception, however, was McKesson's "Horizon Clinicals Meaningful Use Guide" ("user guide") which was dated November 2011 and distributed to every one of its hospital customers

97.     It misrepresented Horizon Emergency Care ability to perform the "core set objectives" and "menu set objectives" required for receiving an incentive payment from the federal government. (As discussed above, McKesson itself admitted in September 2010 that Horizon Emergency Care could not perform 10 of the 23 objectives and that "enhancements" would be necessary—"enhancements," as noted, that were *never* made or tested).

98.     The McKesson "user guide" materially misrepresented Horizon Emergency Care's lack of interoperability and functionality, claiming that the product was a fully integrated, functioning system. (As discussed above, it was not.)

99.     The McKesson "user guide" also baldly and falsely asserted that "Horizon Emergency Care was certified as part of the Horizon Clinicals Complete EHR: Release 10.3.1." It was not. As noted, that certification came only through Marcy Tatsch's "name change only" sleight of hand in March 2011.

100.     As customers began getting ready to report meaningful use of certified software, they reached out to McKesson, including on email exchanges that Dr. Thompson was personally copied on, seeking reassurance that using Horizon Emergency Care in reporting for incentive payments would comply with federal law. In response, McKesson falsely responded that using Horizon Emergency Care in reporting for incentive payments would comply with federal law as a certified "complete" EHR.

101.    To take one example (again, of dozens), in December 2011, a McKesson vice president, Steve Kopech, told St. Luke's Health System that "documentation for clinical quality measures is captured nicely in HEC [that is, Horizon Emergency Care]" and could be "codified and extracted by Performance Analytics for MU [that is, meaningful use] reporting."

102.    To take one more example (again, of dozens), in January 2012 the Memorial Health System's chief information officer, Steve Huffman, emailed a McKesson client executive, Scott Baruch, asking about using Horizon Emergency Care for reporting "meaningful use" to the federal government. Baruch assured him this was appropriate because "HEC [that is, Horizon Emergency Care] has been Certified as part of our Complete EHR certification."

## H. McKesson's False Marketing Statements about Certification Enabled It to Successfully License Its "Complete" EHR to Hospitals

103.    As a result of McKesson's deceptive marketing campaign, from 2011 to 2016 McKesson was able to successfully license and maintain Horizon Clinicals with Horizon Emergency Care (the 2011 version) as a "complete" EHR software bundle to approximately 713 hospitals, earning tens of millions of dollars in fees.

104.    Those McKesson customers, in turn, reported to the federal government through attestations of "meaningful use" for incentive payments.

105.    Several of the hospitals also reported substantial and widespread defective software functionality (which were reported to Dr. Thompson as "at risk" in terminating Horizon Clinicals and Emergency Care engagement agreements with McKesson), as follows:

- Baptist Healthcare System, Inc. (KY)
- BJC Health System (MO)
- CareAlliance Health Services (SC)
- Decatur Memorial Hospital (IL)

-25-

- Elkhart General Hospital, Inc (IN)

- FirstHealth of the Carolinas, Inc (NC)

- General Health System (LA)

- Health Central (FL)

- Memorial Medical Center of East Tex (TX)

- Northwest Medical Center (AZ)

- Pikeville Medical Center, Inc. (KY)

- Regional West Medical Center (NE)

- Skaggs Community Hospital (MO)

- Southwest Washington Medical Center (WA)

- WellStar Health System (GA)

106.    On information and belief, the federal government's total incentive payments to hospitals using Horizon Clinicals totaled approximately $950 million.

**I.    McKesson's Falsehoods Were Material to the Government's Decision to Approve Hospital Claims for "Complete" EHR Incentive Payments**

107.    Based on McKesson's false certification for Horizon Emergency Care, the hospital systems listed above, as well as hundreds of other McKesson customer hospitals, submitted false claims to the federal government seeking reimbursement for using Horizon Emergency Care of which the government paid. In other words, McKesson's false certification caused the government to make incentive payments in response to hospital attestation claims on that product's "meaningful use."[6]

---

[6]As discussed above, those incentive payments were for the "Initial Amount," the "Medicare Share" and "Medicaid Share," and the "Transition Factor."

108.    Had the government been aware of the fact that McKesson had fraudulently procured Horizon Emergency Care's certification, it would never have paid hospitals *any* incentive payments for "complete" EHR "meaningful use" attestations. The law clearly prohibits any payments unless the software was certified:

   a.  Section 4101(a) of the HITECH Act, the Centers for Medicare & Medicaid Services' final rule, 75 Fed. Reg. 44,314 (July 28, 2010), and the regulations promulgated as part of that final rule, 42 C.F.R. Part 495, unequivocally state that incentive payments are expressly conditioned on the "meaningful use" of lawfully "*certified* EHR technology." (Emphasis added).

   b.  Section 4101(a)(1) of the HITECH Act, for example, states a hospital is eligible for the incentive payment only if "a meaningful EHR user," which section 4101(a)(2) of the Act defines as "using *certified* EHR technology in a meaningful manner." (Emphasis added).

   c.  The Centers for Medicare & Medicaid Services' implementing regulations likewise expressly state that eligibility for incentive payments are conditioned on a hospital *attesting* to two things, namely, the hospital (a) "Used *certified* technology," and in so doing (b) "Satisfied the required objectives and associated measures under § 495.6(d) and § 495(e) [*i.e.*, the 23 meaningful use criteria discussed above]." 42 C.F.R. § 495.8(a)(1). (Emphasis added).

109.    Not only was the law clear that only a certified EHR product could qualify for those payments, but the government's administrators made that fact clear. For example, on July 15, 2011, the Department of Health & Human Services' Deputy Inspector General for Evaluations and Inspections wrote a public letter to the Administrator of the Centers for

Medicare & Medicaid Services that repeatedly stated that hospitals "must have certified EHR technology" to be eligible for any incentive payment.[7]

110.    In addition to the certification problem, the government would never have made incentive payments had it *also* known Horizon Emergency Care did not have any functionality on 10 of 23 "core set objectives" and "menu set objectives" required for incentive reporting. *See* 42 C.F.R. Part 495. Those functional performance deficiencies were contrary to the very purpose of the HITECH Act's EHR incentive payment program intended to ensure that hospitals receiving incentive payments provided effective patient care as evidenced by meaningful use objectives.

111.    Horizon Emergency Care meaningful use objective measures should have been a majority of EHR measures for each attesting hospital compared to Horizon Clinicals. As discussed above, emergency departments provide care to roughly five times as many patients as hospital inpatient department and at least 50 percent and as many as 70 percent of hospital patients are admitted *after* patients are treated in the emergency room. Because the required "meaningful use" metrics required the reported calculation be based on all hospital patients seen in either the "inpatient or emergency room department," and the number of patients seen in the emergency department are exponentially larger than the number seen in the inpatient department, hospitals simply could not report meaningful use of certified EHR technology unless they used that technology for their emergency room patients. Accordingly, without certified emergency room EHR technology, hospitals would not have qualified for the incentive payments.

112.    McKesson itself repeatedly admitted that it knew that only lawfully certified EHR products were eligible for incentive payments. McKesson explicitly said so to its hospital

---

[7] https://oig.hhs.gov/documents/evaluation/2892/OEI-05-10-00080-Complete%20Report.pdf

customers in its September 28, 2010, presentation about Horizon Emergency Care (that it would be certified with Horizon Clinicals), but also about any competitor EHR software, stating: "Make sure that the non-McKesson ED [emergency department] system is certified."

113.    McKesson said so in its marketing statements as noted above.

114.    McKesson covered up its lack of certification status, thereby acknowledging that it knew certification was required, by assigning support personnel, such as Nina Bean, Director, Corporate Strategy and Business Development, or Kathleen Aller, Director, Performance Measurement, Enterprise Intelligence, to assist and reassure hospitals in attesting to "meaningful use" measures for their annual attestation payment claims that they were unable to meet through Horizon Emergency Care itself.[8] Through Ms. Bean, Ms. Aller, and other McKesson personnel, McKesson would routinely assist hospitals in estimating those measures for their annual claims for payment, but *not* from data gathered from Horizon Emergency Care as required under the regulations. Dr. Thompson had frequent conversations with Ms. Bean and Ms. Aller about their assistance to those hospitals for their attestations.[9]

115.    Where the government has certified EHR software for incentive payments like these and it later turns out that EHR vendors, like McKesson, "misrepresented EHR capabilities

---

[8] As noted above, under 42 C.F.R. § 495.8(a)(1), a hospital submitting claims for incentive payments only had to make *attestations* on whether it was using certified technology and whether it satisfied "required objectives and associated measures."

[9] Recognizing that it was too difficult and costly to fix Horizon Emergency Care's functionality and lack of integration with Horizon Clinicals, by late 2011 McKesson decided to abandon Horizon Emergency Care altogether. To that end, on December 15, 2011, McKesson Provider Technologies' president, Dave Souerwine, publicly announced that McKesson had chosen not to rewrite Horizon Emergency Care and instead would transition existing hospital clients to "Paragon" software because, as he said, "it's never going to be the fully integrated product that I think our customers want." Even so, hospitals continued to use Horizon Emergency Care up until 2016.

to certify" their products, the government has sought reimbursement from those vendors for Medicare and Medicaid incentive payments, including reaching four public settlements totaling $357.75 million.[10] Whether a EHR product has been lawfully certified is undeniably material to whether the government will make an incentive payment for its use.

**J.    McKesson Retaliates Against Dr. Thompson for Doing the Right Thing**

116.    As all of this was transpiring, Dr. Thompson began to discover that representations McKesson made to customers to induce them to buy McKesson's EHR technologies ranged from deceptive to flagrantly fraudulent. Dr. Thompson expressed his concerns all the way up the management chain. McKesson responded by marginalizing Dr. Thompson and ultimately terminating his employment.

117.    Dr. Thompson first brought his concerns to McKesson's sales executives and leadership. Nothing happened. So after a time, Dr. Thompson brought his concerns up the chain, raising them with Mr. Souerwine and two McKesson executives in charge of software development, Rod O'Reilly and Gerry McCarthy, and McKesson's CEO John Hammergren.

118.    Dr. Thompson showed them numerous flaws in the software. For example, Dr. Thompson demonstrated that the software would generate one patient list when requested through the Horizon Clinicals "physician portal" and a completely different patient list when requested through the Horizon Clinicals "common application framework." This meant that the exact same doctor in the exact same session wanting the exact same thing—his patient list—would get two completely inconsistent results. Using what McKesson marketed as "certified" software, a doctor could not even get a consistent list of his or her patients.

---

[10] https://pmc.ncbi.nlm.nih.gov/articles/PMC9652746/

119.    Dr. Thompson's concerns did not find a receptive audience. Instead, Gerry McCarthy berated Dr. Thompson for "putting this out there." McKesson also began to sideline Dr. Thompson and eliminate his responsibilities, gradually marginalizing him. And in June 2013, McKesson terminated Dr. Thompson without any advance notice.

<u>**COUNT I: FALSE OR FRAUDULENT CLAIMS**</u>
**Federal False Claims Act**
**31  U.S.C. § 3729(a)(1)(A)**

120.    The allegations contained in the prior paragraphs are incorporated by reference as if fully set forth herein.

121.    Defendant McKesson knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), including but not limited to those created by McKesson's compliance and marketing teams, and/or those created or submitted by hospitals based on McKesson's representations, assurances, omissions, and/or inducements.

122.    Such actions were done knowingly, as that term is defined in 31 U.S.C. § 3729(b)(1).

123.    As a direct result of Defendant's acts, the United States has sustained damages for incentive payments in an amount to be determined at trial.

WHEREFORE, Relator James Thompson, on behalf of the United States of America, demands judgment against McKesson Corporation as follows:

   a.    Damages in the amount of three times the loss sustained by the United States of America on account of McKesson's violations of the False Claims Act.

   a.    A civil penalty pursuant to 31 U.S.C. § 3729 of not less than $5,000 and not more than $10,000, adjusted for inflation, for each hospital's false claims for incentive

payment (or approval for incentive payments) for McKesson's Horizon

Emergency Care product, including but not limited to those created by

McKesson's compliance and marketing teams, and/or those created or submitted

by hospitals in furtherance of their attestations for payment.

b. Prejudgment interest.

c. Costs of civil action, including reasonable attorneys' fees and litigation expenses.

Relator James Thompson further prays, on his own behalf, that he be awarded a portion

of the proceeds of this action, as provided by 31 U.S.C. § 3730(d), together with his costs,

including reasonable attorneys' fees.

Relator James Thompson, on behalf of the United States of America and on his own

behalf, further prays that the Court grant such other and further relief as it deems warranted.

## COUNT II: FALSE STATEMENTS
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

124.    The allegations contained in the prior paragraphs are incorporated by reference as

if fully set forth herein.

125.    Defendant knowingly made or used, or caused to be made or used a false record

or statement material to a false or fraudulent claim in violation of the False Claims Act, 31

U.S.C. § 3729(a)(1)(B), including but not limited to those created by McKesson's compliance

and marketing teams, and/or those created or submitted by hospitals based on McKesson's

representations, assurances, omissions, and/or inducements.

126.    Such actions were done knowingly, as that term is defined in 31 U.S.C. §

3729(b)(1).

-32-

As a direct result of Defendant's acts, the United States has sustained damages in an amount to be determined at trial.

WHEREFORE, Relator James Thompson, on behalf of the United States of America, demands judgment against McKesson Corporation as follows:

    b.  Damages in the amount of three times the loss sustained by the United States of America on account of McKesson's violations of the False Claims Act.

    c.  A civil penalty pursuant to 31 U.S.C. § 3729 of not less than $5,000 and not more than $10,000, adjusted for inflation, for each false record or statement material to a hospital's false claim for incentive payments for using McKesson's Horizon Emergency Care product, including but not limited to those created by McKesson's compliance and marketing teams, and/or those created or submitted by hospitals in furtherance of their attestations for payment.

    d.  Prejudgment interest.

    e.  Costs of civil action, including reasonable attorneys' fees and litigation expenses.

Relator James Thompson further prays, on his own behalf, that he be awarded a portion of the proceeds of this action, as provided by 31 U.S.C. § 3730(d), together with his costs, including reasonable attorneys' fees.

Relator James Thompson, on behalf of the United States of America and on his own behalf, further prays that the Court grant such other and further relief as it deems warranted.

## **DEMAND FOR JURY TRIAL**

A jury trial is demanded in this case.

Respectfully submitted,

Washington Global Law Group PLLC

-33-

By: */s/ Max Maccoby*
Max F. Maccoby (admitted *Pro Hac Vice*)
1701 Pennsylvania Ave., NW #200
Washington, D.C. 20006
(202) 248-5434
maccoby@washglobal-law.com

Robert Sidorsky
Daniel M. Branower
RUSSO PLLC
350 Fifth Avenue
Suite 7230
New York, New York 07632
rsidorsky@russopllc.com
daniel@russopllc.com

*Attorneys for Plaintiff-Relator James Thompson*